IN THE SUPREME COURT OF NORTH CAROLINA

2022-NCSC-90

No. 195A21

Filed 15 July 2022

IN THE MATTER OF: M.R., A.R., M.R.

Appeal pursuant to N.C.G.S. § 7B-1001(a1)(1) (2019) from order entered on 9 April 2021 by Judge Resson O. Faircloth in District Court, Harnett County. This matter was calendared in the Supreme Court on 1 July 2022 but determined on the record and briefs without oral argument pursuant to Rule 30(f) of the North Carolina Rules of Appellate Procedure.

*Duncan B. McCormick for petitioner-appellee Harnett County Department of Social Services.*

*Mobley Law Office, P.A., by Marie H. Mobley, for appellee Guardian ad litem.*

*Peter Wood for respondent-appellant mother.*

*David A. Perez for respondent-appellant father.*

BERGER, Justice.

¶ 1     Respondent-parents appeal from an order terminating their parental rights to M.R. (Michael)[1], A.R. (Alice), and M.R. (Mary). For the reasons stated below, we affirm.

**Factual and Procedural Background**

---

[1] Pseudonyms are used in this opinion to protect the juveniles' identity and for ease of reading.

¶ 2    Michael and Alice (the twins) were born in June 2009. On May 17, 2017, the Harnett County Department of Social Services (DSS) obtained nonsecure custody of the twins and filed petitions alleging they were neglected juveniles. The petitions alleged the following: respondent-mother had failed to appear for a court date and was in contempt of court for charges related to truancy; Alice was suffering from a yeast infection or urinary tract infection and respondent-mother failed to seek medical care; Alice had not been taken to a dentist although her teeth were rotting and aching; the twins were required to repeat kindergarten because they had missed forty-five days of school the prior year; respondent-mother did not have stable housing; and the twins reported sleeping on a sofa with men that respondent-mother invited into the home.

¶ 3    The petitions further alleged that despite periodically living with a family friend, respondent-mother and the twins were homeless. In addition, personal effects belonging to the twins and respondent-mother were dirty and kept in trash bags, and the twins' clothing was "so small that it hurt them" to wear. Moreover, the petition explained that Alice had been found unaccompanied at a bus stop, stating that she had not eaten dinner and was hungry. The twins were often late for school because respondent-mother was working late and leaving them with other caretakers. Eventually, respondent-mother voluntarily placed the twins with the maternal

grandmother. In February 2017, DSS developed an In-Home Family Services Agreement with respondent-mother.

¶ 4 The petitions also alleged that on February 24, 2017, respondent-mother moved into a residence of her own. The twins were to remain in a temporary safety provider placement for two weeks while respondent-mother got settled into her home, but respondent-mother took them from the safety provider placement prematurely without notifying DSS. DSS home visits revealed multiple people in the home, and Michael complained about "not being able to rest because of all the people." Respondent-mother could not maintain utilities in the home, and she was evicted on April 17, 2017. During this time, Alice complained "about her private area hurting," but respondent-mother failed to seek medical attention to address Alice's complaints.

¶ 5 On April 20, 2017, respondent-mother was arrested on outstanding warrants for obtaining a controlled substance, identity theft, and trafficking in opiates. Respondent-mother was also charged with possession of drug paraphernalia and possession with intent to manufacture, sell, and distribute heroin. She was released from custody on May 9, 2017, after using Alice's social security benefits to assist with her bond. Respondent-father had been incarcerated since the twins were a few months old and was scheduled to be released in August 2017.

¶ 6 On September 8, 2017, the trial court entered an order following a hearing adjudicating the twins neglected juveniles. The court ordered respondent-mother to

complete a number of objectives related to her substance abuse, parenting skills, housing, and employment. The court ordered respondent-father to comply with the terms and conditions associated with life in the halfway house he was residing at and complete several directives related to housing, employment, and parenting skills. Respondent-parents were granted one hour of weekly supervised visitation.

¶ 7        On December 15, 2017, the trial court entered a permanency planning order finding respondent-mother: had missed scheduled visits with the twins in September and November of 2017; had not made progress on her case plan; had failed to complete a parenting course; had not obtained employment; did not cooperate with a substance abuse assessment or show for a scheduled drug screen in October 2017; and had tested positive for cocaine in December 2017.

¶ 8        Respondent-father had been released from prison in August 2017 but had not visited the twins consistently. He cooperated with a drug screen in December 2017, and tested negative, and reported that he had obtained housing in Fayetteville and employment at a construction company. The trial court set the primary permanent plan to guardianship, with concurrent secondary plans as custody with a relative or other suitable person and reunification with respondent-parents. The trial court also suspended respondent-mother's visitation until she could produce two consecutive negative drug screens.

¶ 9       On March 23, 2018, the trial court entered a permanency planning order finding that the twins had been placed with the paternal great-grandmother since January 29, 2018. Respondent-mother failed to appear for a scheduled drug screen in February 2018 and again when it was rescheduled for March 2018. DSS reported observing respondent-father helping the twins with homework during a visitation, and the paternal great-grandmother reported that respondent-father assisted the twins before and after school.

¶ 10      Mary was born in May 2018, and on June 5, 2018, DSS obtained nonsecure custody after filing a juvenile petition alleging she was a neglected juvenile. The petition alleged that Mary had tested positive for cocaine, marijuana, and opiates at birth and was treated for withdrawal symptoms including tremors, feeding issues, and abnormal muscle tone. Respondent-mother admitted to taking Percocet daily and using cocaine and marijuana during her pregnancy. Following her discharge from the hospital on May 28, 2017, respondent-mother had only visited Mary twice before being arrested for multiple drug-related offenses. DSS also alleged that respondent-father had not made significant progress in complying with his family services agreement.

¶ 11      On July 13, 2018, the trial court entered a permanency planning order as to the twins, finding that the paternal great-grandmother had asked that they be removed from her home on June 8, 2018. The twins were subsequently placed in a

licensed foster home. The trial court found that respondent-mother had failed to cooperate with drug screens, had not visited the twins since December 2017, and was incarcerated in the Harnett County jail for numerous drug-related charges from 2017 and 2018. Respondent-father had not contacted DSS to schedule visitation with the twins since they were removed from the paternal great-grandmother's home, and DSS had been unsuccessful in attempts to contact him to schedule drug screens. The trial court concluded that "reunification efforts with the parents clearly would be unsuccessful [and] should be ceased," and changed the primary permanent plan to adoption, with a secondary plan of guardianship.

¶ 12     On July 6, 2018, the trial court entered an order adjudicating Mary a neglected juvenile. Neither respondent had entered into family services agreements as to Mary. The trial court suspended respondent-mother's visitation with Mary until she could produce two consecutive negative drug screens. The court granted respondent-father one hour of weekly supervised visitation. The court ordered respondent-mother to enter into a family services agreement containing a host of directives related to her release from jail and cooperation with substance abuse and mental health treatments. Respondent-father was ordered to enter into a family services agreement containing directives related to obtaining and maintaining stable housing, complying with drug screens, and completing parenting classes.

¶ 13    The trial court held a hearing regarding Mary on October 12, 2018 and entered a permanency planning order finding that respondent-mother was still incarcerated and had not had any negative drug screens or visits. Neither respondent had entered into out of home family services agreements regarding Mary. At the time of the hearing, respondent-father's whereabouts were unknown and he had not been in contact with DSS since DSS filed the juvenile petition on June 5, 2018. The trial court ceased respondents' visitations with Mary and set the primary permanent plan to adoption, with concurrent secondary permanent plans of guardianship and reunification.

¶ 14    On the same day, the trial court entered a permanency planning order as to the twins finding that respondent-mother had not made any progress since the June 29, 2018, hearing and failed to complete any of her case plan objectives. The trial court also determined that respondent-father had not participated in any services since the June 29, 2018, hearing and failed to complete any of his case plan objectives.

¶ 15    On October 16, 2018, DSS filed a motion to terminate respondents' parental rights to the twins pursuant to N.C.G.S. § 7B-1111(a)(1), (2), and (3). (2021). DSS further alleged that respondent-father had willfully abandoned the twins under N.C.G.S. § 7B-1111(a)(7) (2021).

¶ 16    On June 13, 2019, DSS filed a motion to terminate respondents' parental rights in Mary under N.C.G.S. § 7B-1111(a)(1) and (3). In addition, DSS alleged that

respondent-father had not undertaken any actions required of him to legitimate Mary and had willfully abandoned her pursuant to N.C.G.S. § 7B-1111(a)(5) and (7).

¶ 17        Following hearings on August 16, 2019, the trial court entered permanency planning orders as to all the children finding that respondent-mother had pled guilty to multiple drug-related charges. Respondent-mother's active term of imprisonment had been suspended, and as a term of her probation, she was required to complete the Triangle Residence Options for Substance Abusers (TROSA) program.

¶ 18        Respondent-mother enrolled in TROSA in February 2019. She was compliant with the TROSA program, participating in parenting, anger management, and rational behavior classes, but would not be eligible for day visits with her children until she had completed eighteen months of the program. Respondent-father had not made or documented any progress since the October 2018 hearing.

¶ 19        Following four hearings held in November 2019 and January, February, and July 2020, the trial court entered an order on April 9, 2021, terminating respondents' parental rights to all three children. The court adjudicated the existence of grounds to terminate respondent-mother's parental rights in the twins under N.C.G.S. § 7B-1111(a)(1) and (2) and in Mary under N.C.G.S. § 7B-1111(a)(1). The court adjudicated the existence of grounds to terminate respondent-father's parental rights in the twins under N.C.G.S. § 7B-1111(a)(1), (2), (3), and (7) and in Mary under N.C.G.S. § 7B-1111(a)(1), (5), and (7). The court also concluded that it was in the children's best

interests that respondents' parental rights be terminated. *See* N.C.G.S. § 7B-1110(a) (2021). Respondents timely filed notice of appeal.

**Standard of Review**

"We review a trial court's adjudication under N.C.G.S. § 7B-1111 'to determine whether the findings are supported by clear, cogent and convincing evidence and the findings support the conclusions of law.'" *In re E.H.P.*, 372 N.C. 388, 392, 831 S.E.2d 49, 52 (2019) (quoting *In re Montgomery*, 311 N.C. 101, 111, 316 S.E.2d 246, 253 (1984)). This Court limits its review of the findings of fact to "only those findings necessary to support the trial court's determination that grounds existed to terminate respondent's parental rights." *In re T.N.H.*, 372 N.C. 403, 407, 831 S.E.2d 54, 58–59 (2019). "A trial court's finding of fact that is supported by clear, cogent, and convincing evidence is deemed conclusive even if the record contains evidence that would support a contrary finding." *In re B.O.A.*, 372 N.C. 372, 379, 831 S.E.2d 305, 310 (2019). "Findings of fact not challenged by respondent are deemed supported by competent evidence and are binding on appeal." *In re T.N.H.*, 372 N.C. at 407, 831 S.E.2d at 58. We review the trial court's conclusions of law *de novo*. *In re C.B.C.*, 373 N.C. 16, 19, 832 S.E.2d 692, 695 (2019).

"If [the trial court] determines that one or more grounds listed in section 7B-1111 are present, the court proceeds to the dispositional stage, at which the court must consider whether it is in the best interests of the juvenile to terminate parental

rights." *In re D.L.W.*, 368 N.C. 835, 842, 788 S.E.2d 162, 167 (2016) (citing *In re Young*, 346 N.C. 244, 247, 485 S.E.2d 612, 614–15 (1997); N.C.G.S. § 7B-1110 (2021)). A trial court's best interests determination "is reviewed solely for abuse of discretion." *In re A.U.D.*, 373 N.C. 3, 6, 832 S.E.2d 698, 700 (2019) (citing *In re D.L.W.*, 368 N.C. at 842, 788 S.E.2d at 167). "An abuse of discretion results where the court's ruling is manifestly unsupported by reason or is so arbitrary that it could not have been the result of a reasoned decision." *In re T.L.H.*, 368 N.C. 101, 107, 772 S.E.2d, 451, 455 (2015) (cleaned up).

¶ 22    In determining whether termination of parental rights is in the best interests of a juvenile:

> The court may consider any evidence, including hearsay evidence as defined in [N.C.]G.S. 8C-1, Rule 801, that the court finds to be relevant, reliable, and necessary to determine the best interests of the juvenile. In each case, the court shall consider the following criteria and make written findings regarding the following that are relevant:
>
> (1) The age of the juvenile.
>
> (2) The likelihood of adoption of the juvenile.
>
> (3) Whether the termination of parental rights will aid in the accomplishment of the permanent plan for the juvenile.
>
> (4) The bond between the juvenile and the parent.
>
> (5) The quality of the relationship between the juvenile and the proposed adoptive parent, guardian, custodian, or other permanent placement.

(6) Any relevant consideration.

N.C.G.S. § 7B-1110(a) (2021).

**Respondent-Mother's Appeal**

Respondent-mother challenges the trial court's adjudication of the existence of grounds to terminate her parental rights in the twins under N.C.G.S. § 7B-1111(a)(1) and (2) and in Mary under N.C.G.S. § 7B-1111(a)(1). She also contends the trial court abused its discretion in determining that it was in the twins' best interests that her parental rights be terminated.

A trial court may terminate parental rights if it concludes the parent has neglected the juvenile within the meaning of N.C.G.S. § 7B-101. N.C.G.S. § 7B-1111(a)(1). A neglected juvenile is defined, in pertinent part, as a juvenile "whose parent, guardian, custodian or caretaker . . . [d]oes not provide proper care, supervision, or discipline[;] . . . [or c]reates or allows to be created a living environment that is injurious to the juvenile's welfare." N.C.G.S. § 7B-101(15) (2021).

"[E]vidence of neglect by a parent prior to losing custody of a child—including an adjudication of such neglect—is admissible in subsequent proceedings to terminate parental rights," but "[t]he trial court must also consider any evidence of changed conditions in light of the evidence of prior neglect and the probability of a repetition of neglect." *In re Ballard*, 311 N.C. 708, 715, 319 S.E.2d 227, 232 (1984). The "determinative factors" in assessing the likelihood of a repetition of neglect are

"the best interests of the child and the fitness of the parent to care for the child *at the time of the termination proceeding." In re Z.G.J.*, 378 N.C. 500, 2021-NCSC-102, ¶ 26 (quoting *In re Ballard*, 311 N.C. at 715, 319 S.E.2d at 232).

¶ 26    Respondent-mother does not contest the fact that the children were previously adjudicated neglected. Instead, she challenges the trial court's conclusion that there was a likelihood of future neglect, specifically arguing that the court based this determination on her "behavior in the distant past" and failed to acknowledge her compliance with the case plan after entering TROSA in February 2019.[2] She also argues the trial court erred in concluding that grounds existed to terminate her parental rights under N.C.G.S. § 7B-1111(a)(1).[3]

¶ 27    Here, the trial court's conclusion that there was a likelihood of future neglect if the children were returned to respondent-mother's care is supported by its unchallenged findings of fact demonstrating respondent-mother's inability to provide proper care, supervision, discipline, and a living environment not injurious to their welfare at the time of the adjudication portion of the termination hearing. The court's

_____

[2] We note that the trial court labeled its determinations that respondent-mother neglected the children, and grounds exist to terminate respondent-mother's parental rights as findings of fact. These determinations are more properly classified as conclusions of law. *In re J.O.D.*, 374 N.C. 797, 807, 844 S.E.2d 570, 578 (2020). "[F]indings of fact [which] are essentially conclusions of law . . . will be treated as such on appeal." *State v. Sparks*, 362 N.C. 181, 185, 657 S.E.2d 655, 658 (2008) (alterations in original).

[3] Respondent-mother also challenges findings of fact 156 and 162 and conclusion of law 6. Because they are not necessary to support the trial court's determination that grounds existed to terminate respondent-mother's parental rights under N.C.G.S. § 7B-1111(a)(1), we do not address these challenges.

unchallenged findings further show that the family's history with DSS began in 2015 when respondent-mother was unable to provide stable housing for herself or the twins, the twins were frequently late to school and picked up early from school, and the twins had to repeat kindergarten. DSS was involved with the family again in 2016 after respondent-mother and the twins were regularly homeless and the twins often showed up late for school wearing ill-fitting clothing.

¶ 28          Uncontested findings establish that in February 2017, respondent-mother developed an in-home family services agreement with DSS but failed to meet its goals and objectives prior to the filing of the May 17, 2017, juvenile petitions. In 2017, respondent-mother had multiple people in her home, Michael complained about being unable to rest, and Alice complained about her "private area hurting her again." Respondent-mother was unable to maintain utilities in her home and was served with an eviction notice in April 2017. On April 20, 2017, she was arrested at the twins' school and charged with multiple drug-related offenses. The court awarded DSS nonsecure custody of the twins on May 17, 2017. Respondent-mother did not complete a parenting course, failed to appear for multiple drug screens, tested positive for cocaine in December 2017, and continued to use illegal drugs during her pregnancy with Mary. Respondent-mother did not obtain prenatal care for Mary, and Mary tested positive for cocaine, marijuana, and opiates at birth. On June 5, 2018, DSS obtained nonsecure custody of Mary.

¶ 29       The court also made unchallenged findings that respondent-mother was incarcerated from May 2018 to January 2019. In January 2019, she pleaded guilty to drug-related offenses and was sentenced to consecutive terms of eleven to twenty-three months and eight to nineteen months of imprisonment. Her sentence was suspended, she was placed on probation subject to a condition that she enroll in and complete TROSA, an "intensive, residential substance abuse treatment and behavior modification program." The court found that respondent-mother had made no progress between May 2017 and February 2019, when she enrolled in TROSA. While respondent-mother was compliant with the TROSA program, she was not scheduled to complete TROSA until February 2021 and would only be "eligible for day visits with her children after completing 12, 14, 16, and 18 months" and for "off-campus overnight visits after she has been in the program for 21 months."

¶ 30       Respondent-mother asserts that her compliance with the case plan after entering TROSA "only supported a finding that it was unlikely for the children to be neglected again." While we recognize the progress she made in complying with her case plan, "a parent's compliance with his or her case plan does not preclude a finding of neglect." *In re J.J.H.*, 376 N.C. 161, 185, 851 S.E.2d 336, 352 (2020) (citing *In re D.W.P.*, 373 N.C. 327, 339–40, 838 S.E.2d 396, 406 (2020)). As the trial court found, respondent-mother only began complying with her case plan in February 2019, nearly twenty-one months after the twins were taken into DSS custody. She continued to

use illegal drugs through May 2018 and did not engage in substance abuse treatment or parenting classes until February 2019. At the time of the termination hearing, respondent-mother was not scheduled to complete the TROSA program until February 2021 and would not be eligible for off-campus, overnight visits until November 2020.

¶ 31    Respondent-mother lacked the ability to provide proper care, supervision, discipline, and a living environment not injurious to the children's welfare at the time of the termination hearing despite having ample opportunity and time to overcome the obstacles preventing her from doing so. Thus, the trial court did not err in determining that future neglect was likely if the children were returned to her care, and we affirm the trial court's determination that respondent-mother's parental rights in the children were subject to termination pursuant to N.C.G.S. § 7B-1111(a)(1). We therefore need not reach respondent-mother's challenge to the trial court's conclusion that grounds existed to terminate her parental rights to the twins under N.C.G.S. § 7B-1111(a)(2). *In re M.A.*, 374 N.C. 865, 875, 844 S.E.2d 916, 924 (2020) ("[T]he existence of a single ground for termination suffices to support the termination of a parent's parental rights in a child.").

¶ 32    Next, respondent-mother contends the trial court abused its discretion in determining it was in the twins' best interests that her parental rights be terminated.

Respondent-mother first challenges dispositional findings 8, 10, and 15 as being unsupported by the evidence:

> 8. The juveniles are adoptable. Notwithstanding the likelihood that the adoption is high the foster parents want to adopt the juveniles after completing adoption proceedings on another child in their care.
>
> . . .
>
> 10. The foster parents of the twins are willing to adopt.
>
> . . .
>
> 15. Termination of parental rights will aid in the accomplishment of the primary permanent plan of adoption.

¶ 33  A review of the record, however, demonstrates that these challenged findings are supported by competent evidence. A DSS social worker testified that the twins had been placed in a pre-adoptive foster home since January 2018 and that the foster parents were willing to adopt the twins. The DSS social worker further testified that the twins were adoptable, adoption was likely, and termination of parental rights would clear a "major barrier" in accomplishing the primary plan of adoption. Accordingly, we reject respondent-mother's challenges to these dispositional findings of fact.

¶ 34  Next, respondent-mother contends that the trial court erred in concluding that termination was in the twins' best interests when three factors weighed against termination: the bond between the twins and respondent-mother, including the twins'

wishes to stay with her; the likelihood of adoption of the twins; and respondent-mother's continued success in complying with her case plan.[4]

¶ 35    We emphasize that it is within the trial court's discretion "to weigh the various competing factors in N.C.G.S. § 7B-1110(a) in arriving at its determination of the child's best interests." *In re N.C.E.*, 379 N.C. 283, 2021-NCSC-141, ¶ 30. "[T]he bond between parent and child is just one of the factors to be considered under N.C.G.S. § 7B-1110(a), and the trial court is permitted to give greater weight to other factors." *In re Z.L.W.*, 372 N.C. at 437, 831 S.E.2d at 66. In addition, "while the trial court is entitled to consider the children's wishes in determining whether termination of their parents' parental rights would be appropriate, their preferences are not controlling given that the children's best interests constitute 'the polar star' of the North Carolina Juvenile Code." *In re M.A.*, 374 N.C. 865, 879, 844 S.E.2d 916, 926–27 (2020) (quoting *In re T.H.T.*, 362 N.C. 446, 450, 665 S.E.2d 54, 57 (2008)).

¶ 36    Here, the trial court's findings demonstrate that it considered the dispositional factors set forth in N.C.G.S. section 7B-1110(a) and "performed a reasoned analysis weighing those factors." *In re Z.A.M.*, 374 N.C. 88, 101, 839 S.E.2d 792, 801 (2020). The trial court found that the twins were eleven years old and that they were

---

[4] Specifically, respondent-mother challenges dispositional finding of fact 53 and conclusion of law 2 which both provide as follows: "It is in the best interests of the twins to terminate the parental rights of the parents." Although the trial court labeled this determination a finding of fact, it is a conclusion of law, and we review it accordingly. *See Sparks*, 362 N.C. at 185, 657 S.E.2d at 658.

adoptable. The likelihood of adoption was high, and their foster parents wanted to adopt the twins after completing adoption proceedings on another child that was in their care. While the trial court found that the twins had a bond with respondent-mother, they had a "strong parent-child bond" with their foster parents as well, referring to them as "mom and dad." The trial court also made findings detailing their consideration of respondent-mother's compliance with the TROSA program.

¶ 37    Here, the trial court made sufficient dispositional findings and performed a reasoned analysis of the relevant factors. The trial court's decision is not "manifestly unsupported by reason or is so arbitrary that it could not have been the result of a reasoned decision." *In re T.L.H.*, 368 N.C. 101, 107, 772 S.E.2d, 451, 454 (2015). Thus, the trial court did not abuse its discretion in concluding it was in the twins' best interests to terminate respondent-mother's parental rights. The trial court's order terminating respondent-mother's parental rights in the children is affirmed.

## Respondent-Father's Appeal

¶ 38    Respondent-father's sole argument on appeal is that the trial court abused its discretion in determining it was in the twins' best interests to terminate his parental rights. While acknowledging that the trial court made extensive dispositional findings, "addressing far more than just the five factors specified in [N.C.G.S.] § 7B-1110(a)," he argues that the trial court did not properly consider the issue of whether the twins would consent to their own adoptions and that the twins were not in a

position to be immediately adoptable. He contends that the trial court "improperly weighed the evidence" to such a degree that its decision amounted to an abuse of discretion.[5]

¶ 39        As respondent-father points out, N.C.G.S. § 48-3-601 (2021) provides that a juvenile over the age of twelve must consent to an adoption. While we note that the twins were eleven years old at the time of the termination hearing, N.C.G.S. § 48-3-601 governs adoption, rather than termination of parental rights proceedings. Also, N.C.G.S. § 48-3-603(b) provides that a trial judge may dispense with the requirement that a child who is twelve years of age or older consent to an adoption "upon a finding that it is not in the best interest of the minor to require the consent." N.C.G.S. § 48-3-603(b)(2) (2021). Hence, any refusal on the part of the twins to consent to a proposed adoption would not preclude their adoption. Even assuming that the twins were not in a position to be immediately adoptable, "the absence of an adoptive placement for a juvenile at the time of the termination hearing is not a bar to terminating parental rights." *In re A.J.T.*, 374 N.C. 504, 512, 843 S.E.2d 192, 197. Thus, respondent-father's arguments are unavailing. The order of the trial court is affirmed.

---

[5] Like respondent-mother, respondent-father challenges dispositional finding of fact 53 and conclusion of law 2 which determine that it is in the twins' best interests to terminate his parental rights. As stated above, although the trial court labeled this determination as a finding of fact, it is more properly classified as a conclusion of law, and we review it as such.

AFFIRMED.